We'll hear argument this morning in Case 18-966, the Department of Commerce v. New York. General Francisco. Mr. Chief Justice, and may it please the Court. In March 2018, Secretary Ross reinstated a citizenship question that has been asked as part of the census in one form or another for nearly 200 years. The District Court's invalidation of that decision was wrong. I'm sorry. It's not been a part of the survey, which is where he reinstated it, since 1950. And for 65 years, every Secretary of the Department of Commerce, every statistician, including this Secretary's statistician, recommended against adding the question. So it may be that 200 years of asking a citizenship question in other forms may be true, but not on the short survey. That's what's at issue. But, Your Honor, it has been part of the census for the better part of 200 years, initially as part of the overall census itself that went to all individuals. But don't we ask the question in context? And for 65-odd-plus years, everybody said don't add it? No, Your Honor, because, in fact, it was included in the long-form census until the year 2000. That's the whole issue. It could have been included in the ACS, which is still being done. And that's being done every first, third, and fifth year. Yes, Your Honor, but it has been part of the census in one form or another for a very long period of time. So the question, therefore, is two things. First, we think that the Respondent's claims are not justiciable because their injuries aren't fairly attributable to the government or subject to APA review. And secondly, the Secretary acted well within his discretion when he determined that reinstating the citizenship question would provide the best evidence of citizenship. Can we just go back a bit to your opening? Why was the citizenship question dropped in 1960 and remained off for all the decades after that? What was the reason for dropping it? Your Honor, in 1960, it didn't appear in anything, and it was moved on to the American Community Survey. That was part of an overall movement of most of the demographic – I'm sorry, on to the long-form census, not the American Community Survey. And that was part of a larger process that moved a large number of demographic questions off of the short form and on to the long form. We no longer have a long form, so then the question is, do you reinstate the long form, or do you, in fact, move it back on to the short form census? It was eminently – Didn't the Census Bureau give a reason why it was dropped? Well, they generally wanted to move all of the demographic questions on to the long form. We no longer have a long form, and the problems with using the American Community Survey are well known. But there was nothing in 1960 to the effect that the Census Bureau found that putting it on the short form would depress the count of non-citizens? Nothing like that? Well, sure, Your Honor, but that's because they thought that, along with all of the other demographic questions in the census, had an overall impact on overall census accuracy. And that underscores why we don't think this is really subject to judicial review. Because really what you're saying is that courts would have to review every question on the long form to determine if the informational value of the question outweighed the impact on census accuracy. Because at the end of the day, if you add any particular question on to the census, you're always trading off information and accuracy. And 141A doesn't provide courts with a basis for evaluating that determination. So that's why we think this isn't subject to APA review at all, but we also think that the respondents don't have standing here. Because they're injured if and only if, first, you have third-party action, secondly, you have third-party action that's illegal, and third, that third-party action is based on speculation that the government will itself violate it. On the illegality, is that a predictive factor? In other words, do we, as our cases have often said, do not assume illegal behavior in establishing standing? But is that simply predictive? In other words, we doubt people are going to engage on a regular basis in illegal behavior, and therefore we don't think their injury is tangible or likely. Or is there something special about the fact that it's illegal activity? Well, I think, Your Honor, in the court's past cases, it has often been used as a predictive factor. But I also think that when you put it all together, it breaks the chain of causation for Article III causation purposes. I mean, it is true that if people go 60 miles an hour in a 55-mile-an-hour zone, that's unlawful. But you wouldn't say that they're not going to do that in forming public policy or considering standing. I agree, Your Honor, and that's not our argument here. I think that Clapper is a good analogy. It was quite clear that the plaintiffs in that case suffered an injury in fact because they declined to use their cell phones to communicate with their clients, and their clients declined to use their cell phones to communicate with them out of a fear that their phone calls would be intercepted. No question that there was an injury in fact. But what the court held was that that injury wasn't fairly attributable to the government because it was caused by the plaintiffs' fear that the government would intercept their calls. You're talking proximate cause, which we've never used. No, Your Honor. We've used determinate or coercive effect in Wayfair. One of the reasons we found the stores, not the states, to be injured is because consumers failed to pay taxes, an illegality under the law. We said that's why the states were being harmed. In NAACP v. Alabama, we held the NAACP had standing, even though it was their members who would be injured by other people, an illegality, harassment. But as Chief Justice Roberts said, it's predictable. There is no doubt that people will respond less because of the census. That has been proven in study after study. One census surveyor described an incident where he walked into a home, started asking citizenship, and the person stopped and left his home, leaving the census surveyor sitting there. So if you're talking about prediction, this is about 100% that people will answer less. But I don't know that it's prediction. It's an action by the government will be a cause of this. Not proximate necessarily, but that cause will cause harm. Right. Two responses, Your Honor. First, we're not talking about proximate cause. We're talking about an analysis that was similar to what this court used in the Clapper case, where the Clapper said that even though there was injury in fact, even though the government's actions were in a very real sense a but-for cause of that injury in fact, it wasn't fair to attribute that to the government because it was based on the plaintiff's speculation that the government would intercept their telephone call. But this is not the plaintiff's action. This is third-party's action. Yes, and that makes it, we think, even worse because the court's cases have generally said you don't rely on third-party standing. You said you had two responses? Yes, the second is that on NAACP against Alabama, that was a case where the NAACP was being directly regulated by the statute that they were challenging. They were forced to disclose their private membership list, and that was their injury. There was nobody that stood in between them and the disclosure of their private membership list. But turning to the agency reviewability argument, there really is nothing in 141A that provides courts with a basis to review this decision. The language is quite similar to what the court addressed in Webster. The addition of any particular demographic question is always going to be a tradeoff between information and accuracy, and I'd urge you to look to the 2000 long-form census that had highly detailed questions about not just citizenship, but things like your commuting time, how many bedrooms you had in your house, whether you suffered from certain health conditions. Under respondent's position, courts would have to review each one of those questions to determine whether the informational value of that question outweighed any potential impact on census accuracy. On the main form, suppose the secretary puts in a question about sexual orientation. Suppose he puts a question in about arrest record. Suppose he says, I'm going to have the whole survey in French. In other words, we have no role to play, no matter how extreme. Your Honor, you certainly do have a role to play. That's the question. And in this case, there's a statute. And the statute says that the secretary, at least on this form, the main form, he shall use administrative records. Unless, you know what it says, to the maximum extent possible. Don't ask direct questions. Use administrative records because they want to keep it short. Right. To the maximum extent possible. So I have two rather technical questions on what I think is the heart of this case. It's a technical case. All right. The first question is, the secretary, I gather from the record, and we've looked at it in my office pretty carefully, is told by the Census Bureau in three studies that if you ask this question on the regular form, you will get back fewer answers. And they extrapolated to do that from the other surveys and so forth. And those extrapolations, you know, holding for everything constant, showed that the non-citizens often didn't say they were non-citizens. And some didn't return it at all. Now, I haven't seen any evidence to the contrary, so I'm asking where the evidence is on that. Sure. And as to the second, same question. The second is that several surveys, including Dr. About, told the secretary, Mr. Secretary, if you add the question to the census, the short form, the direct form, you will discover that even the information you want about citizenship is worse than if you just look at the administrative record. Now, how can that be? Sure. Well, A, they say 13 million people, it'll be a wash because you won't get information either way. They won't return it and you don't have it over on the administrative part. But as to 22 million, which you highlight in your brief, what about them? And as to them, what Dr. About says, he says, and I saw it in the record, he says, as to those 22 million, I'll tell you what, you just look to the census returns and you're going to find it not that accurate because some are not going to tell the truth. Right. So go look at the administrative returns. They won't be there, but we'll model them. Now, the question is, which is more accurate as to citizenship? Sure. The models over here on the administrative part or the answer to the questions on the census part? And here's what Dr. About says. 22 million, he's asked. If you follow your practice, you'd use a survey response, not model it. Is that right? That's right.  That's correct. And the conclusion of the Census Bureau remains that adding the question over here, even if you use the administrative part too, produces worse data on citizenship than just using the administrative data alone. That's the question. Yep. Answer from the expert. That's correct. So I read that, and it's, you know, the judges below have listed 14 other examples or 40 other examples of many other examples, but that's the most direct. So where in the decision memo did the secretary address that problem? So sure, Your Honor. Both problems. Yes. And I'd like to address that evidentiary issue first, and then I would like to come back to your question about Section 60 of the statute as well. If you look at the Joint Appendix, page 148, the Census Bureau staff specifically told the secretary, and here I'm quoting from it, that it, quote, cannot quantify the relative magnitude of the errors across alternatives, and he's talking about alternatives C and D at this time. So what he was saying was that I don't know if the response error from asking the question is going to be more or less than the prediction error. No, he said just what you said. He said I cannot quantify it, and that means he can't put scientific numbers. Of course they said that they wanted two years to test it, but they can't quantify it. But we do have three studies, and those studies look at what happened. When you asked this question before, and what happened when you asked this question before is the response rate fell. And so if I could complete my answer, what the Bureau staff told him was that they didn't know which one would be better or worse. So what the secretary said to that. Maybe you could, if you don't mind, maybe you could complete your answer. Sure. That is specifically, Your Honor, at page 148 of the Joint Appendix, where it specifically says and explains that it cannot quantify the relative magnitude of the errors across the alternatives, alternatives C and D at this time, because it didn't know if the response errors from asking the question would be more or less than the prediction errors from the model. So what the secretary knew was two basic things. I'm sorry. They have prediction models. They say multiple times, at least three if not more, that alternative D, which was the secretary's alternative, and their alternative C, so everybody is clear, C was simply to use administrative records. D was the secretary's idea of adding the question to the survey plus administrative records. And on the prediction models, which is what scientists can do, each and every time they said D would be less accurate than C. Except for the one time where it mattered, Your Honor, in the key differences memo, where they specifically said that they did not know if C was better than D. No, no, that's not what he said. He said the words comparative errors have a different meaning than you're giving it. Comparative errors are I'm comparing this type of error to that type of error and what they compare each other to. You can't do that to a scientific certainty. But you can have predictive models, which is what they did, and they showed you time and again they told you, you add the survey question, it's going to be less accurate than just relying on administrative records. So how do you take or pluck out of what they say in one sentence, if you're the secretary, and rely on that one sentence and ignore the wealth of statistics, graphs, testimony, proof, control studies of how these response rates came about, and decide that that one sentence is enough to justify ignoring everything else? Because, Your Honor, I respectfully disagree with your reading of the administrative record. If you read through the key differences memo, what the Bureau staff is telling the secretary, look, there's no question that the Bureau staff preferred not to have this question on the census, but what they were telling the secretary was that they couldn't tell which model would be more or less accurate, but they did give him specific information. They told him that if he actually asked the question for 22.2 million people for whom no administrative records existed, he would have got actual answers at 98% accuracy, and that the alternative, their preferred alternative, was to use a statistical model to estimate citizenship, not just for the 22.2 million, but for 35 million, but they had not yet constructed that model and didn't know what the error rate in that model would be. I think, Your Honor, I mean, 98% sounds awfully high, but it's kind of irrelevant, too. The question is whether if he used the model, it would be greater than 98%. It would be 99.5%. Because then the secretary would have no basis for saying that you should use the question rather than the model. And as to that, as I think my colleagues are suggesting, there is a bottom-line conclusion from the Census Bureau, and the bottom-line conclusion is that alternative D, which is the proposal that the secretary eventually took, would still have all the negative cost and quality implications of alternative B, which was simply adding the question alone, and would result in poorer quality citizenship data than alternative C, which is just using the administrative records plus the modeling. So there is a bottom-line conclusion from the Census Bureau, and it seems as though what the secretary needs is some, I mean, a secretary can deviate from his expert's recommendations and from his expert's bottom-line conclusions. But the secretary needs reasons to do that. And I searched the record, and I don't see any reason. Sure. And, Your Honor, so I want to just finish what I was saying instantly before, because I think it responds to your question, and then I'd like to expand directly in response to your question. What the secretary concluded was in the face of uncertainty, he'd rather go with the bird in the hand and ask the question at 98% accuracy than an unknown and untested statistical model. And that's, after all, the same preference that the Enumeration Clause itself makes, a preference for actual counting over estimation, because actual counting is such an individual. Let me just add to it a bit, because you said, you know, an unknown and untested statistical model. But here are his experts in the Census Bureau saying, we are confident that we can produce a statistical model that will produce more accurate bottom-line results. And, again, this bottom-line conclusion is the same. They know what kind of statistical models they can build, and this is the bottom-line conclusion. And where is the reason that the secretary gives as to why he rejects that? So there are a couple of reasons, Your Honor. First of all, although they had a high confidence that they could create a good statistical model, they were not able to tell him that they thought that that model would be any better or worse than estimation. They never were able to say that it would beat that 98% number. So in the face of that uncertainty— I think what I read you is them saying that they could beat the 98% number. No, Your Honor, I don't think that's what they're saying there. I think what they're saying there is that if you ask the citizenship question, it will make the model a little bit less accurate, because you're going to have fewer people for whom there are administrative records. But you actually have to use that model for a much smaller number of people, because you have actual answers from 22.2 million at 98% accuracy. So that's what they're saying, but what they couldn't come down with a conclusion on is whether it would be more or less accurate to ask the question or use the model. So can I just ask— Before you answer this question, I am trying—go back to my question—to write down the pages. I'm not going to, you know, resolve this right now. So when Justice Kagan asked the question, or I do, you've mentioned page 148, insofar an answer to her question or to mine. If you could give me a few things to read to show that he did consider it, to show that he did give a reason for rejecting it, that would be helpful to me. Sorry, go back. So, Your Honor, if you look at Secretary Ross's decision memo, the decision memo in the petitioner's appendix, I would look to a couple of things. First of all, I would look to his discussion on pages 555A with the problems with administrative records. The Bureau is still evolving its use of administrative records, and the Bureau does not yet have complete administrative records data set for the entire population. And that points out why he preferred asking the question and getting actual answers from 22.2 million people at 98% accuracy, because you simply didn't have administrative records for 35 million people, and the Bureau had not yet figured out how to do that estimation. He then goes on to say on that same page, more than 10% of the American population, some 25 million voting-age people, would need to have their citizen age imputed by the Census Bureau. And so he was making clear that he'd rather go with actual counting than imputation. And he pointed out that by proceeding with his preferred course, this is at page 556A of the petitioner's appendix, this may eliminate the need for the Census Bureau to have to impute an answer for millions of people, specifically about 22.2 million people for whom the Bureau told him he would get actual answers. If I may say, General, when you think about those statements, I mean, it's just conclusory. It's just like, well, this would eliminate the need for modeling, because we could ask the question. But the question is, why is asking the question better, when you know that asking the question is going to result in lots of non-responses and in lots of false reporting? And so you can't just go back to, I'd rather ask a question. You have to say why you'd rather ask a question and what benefits it has to ask the question. And if I may say, I'll just finish here, General. I mean, a lot of your arguments, your briefs are extremely well done, but a lot of your arguments just do not appear in the Secretary's decision memo. And the fact that S.G. lawyers can come up with 60 pages of explanation for a decision, that's all post hoc rationalization. The question is, what did the Secretary say? Where did he say it? When did he say it? What does it mean other than just ipsodixit and conclusions? Your Honor, I'm tempted to pocket the compliment and sit down, but I won't do that. I think the Secretary fully acknowledged that there was an upside to the request, and the upside was the one that the Department of Justice set forth in his letter, that having citizenship data would help improve Voting Rights Act enforcement. He fully understood there was an alternative, using administrative records, and he analyzed that alternative in the language that I just read to Justice Breyer, and he understood there was a downside, that adding the citizenship question would potentially increase self-response, decrease the number of, decrease the number of self-response rates. But he found two things with respect to that. First, he found, and all of this is in his letter, that he could mitigate that to at least a certain extent with follow-up operations, perhaps not entirely, but at least to a certain extent. And secondly, to the extent that materialized, it was the product of illegal activity. So he considered the benefits, he considered the alternatives, he considered the costs, and he concluded that the benefits outweighed the costs. Which letter are we talking about? The Secretary Ross's decision memo in March 2018. The memo, right? Yes, Your Honor. The memo, but the Department of Justice's letter is the one that articulated the Voting Rights Act rationale that formed the principal benefits. Can you explain how it would improve Voting Rights Act enforcement? Yes, Your Honor. One of the critical elements of Voting Rights Act enforcement is something called citizen voting age population, or CVAP. Right now, everything for CVAP comes from the census with the exception of citizenship. So population, age, race, all of that comes from the census except for citizenship, the C in CVAP. So a large amount of voting rights litigation focuses on expert witnesses who try to fill in that missing C and try to estimate that missing C through imputation based on the American Community Survey, which goes to just one in 38 households. And the Department of Justice wanted to get all of the same information from the same database so that critical feature of voting rights litigation, CVAP, all came from the same place. General, how do we know that DOJ couldn't do alternative C, rely on the administrative records? The one thing that we do know is that the secretary went to the department, went to DOJ at the beginning and asked them for help in adding the citizenship question. They initially said no. At least their lower level people said no. Told them to shop it to DHS and see if DHS wanted the citizenship question. DHS said, not our work, go back to DOJ. They go back to DOJ, the people they're in touch with, I don't know at what level, but they're not the highest level, say no, and Secretary of Commerce speaks to the head of DOJ at the time. And the head of the DOJ says, we'll give you anything you need. They do a letter. The letter says the ACS is not enough. What the letter doesn't say is, ah, if you supplement it with administrative records, which 6C lets you do and tells you you should do to maximize the extent possible that the actual count is accurate, and we do know that there will be less people being reported, which is the whole purpose of the survey, how many people there are, and nobody doubts that there will be less people reported. That's a maximum need of the census survey report, not citizenship. Let's not confuse the two things. The enumeration is how many people reside here, not how many are citizens. That's what the census survey is supposed to figure out. DOJ needs citizenship. But when the Bureau asks DOJ, not the Secretary, to meet so they can discuss why the administrative records are not good enough, they say, we don't need to. So tell me, in that sequence, how does the Secretary know the answer to that question? Sure. So a couple of responses to that, Your Honor. I'm going to start with the 6C issue because I know that was of interest to Justice Breyer as well. And under 6C, under my friends on the other side's position, you actually couldn't even ask the citizenship question on the American Community Survey. And you also couldn't ask about sex and age on the census itself, since all of that information is also available in administrative records. But the reason why administrative records are insufficient under 6C for any of these purposes is for the simple reason that you don't have them for 35 million people. In terms of the Department of Justice's request and the Census Bureau's alternative proposal, it simply wasn't responsive to the Department of Justice's request for two reasons. First, administrative records didn't solve the problem that the Department of Justice was trying to solve, which was getting all of their CVAP data from the same source and covering the same time period. Administrative records come from a different database and cover a different time period than all of the other information used to construct citizenship. That doesn't tell you why it's not good enough. They may have wanted something, but they would then be introduced with one database that has been, according to the chief statistician of the Bureau, introducing multiple layers of uncertainty. Uncertainty about or an undercount of people, because they already say that undercount is going to be at a minimum 5.8. Less people are going to respond. You're going to have a lesser number that are going to group with the administrative record. You're going to have 9.5 million that conflict between their answer and the administrative records. And we have to change the Bureau's use of that information to be able to use the administrative record. And the secretary doesn't ask, if we change that, what else will it affect? So he doesn't know that. And we now have error in the unreporting population of at least 500,000. So something the chief statistician of the Bureau tells us is, unlike our simpler prior models, this introduces more uncertainty at every single level of the calculus. And so that data is going to be more suspect, more prone to less reliability, and less accurate. And so if the Department of Justice refused to listen to that, how can the secretary conclude that he's complying with 6C fully? Because it says to the maximum extent possible. And how can you be possible if you don't even ask why? This seems like he thought of something. I want to add a citizenship question. I don't know why. But this is a solution in search of a problem. I've got to find a problem that fits what I want to do. So, Your Honor, there's a whole lot in that question. But I think I will start with where you ended. And if you really think 6C is a problem, then we really cannot ask the citizenship question on the American Community Survey, since that is just as subject to 6C as the statistician. No, what it says is to the maximum extent possible. And here the secretary is using the administrative records to the maximum extent possible. But the ACS is not the survey. He's combining them with the administrative records and the self-responses, and using administrative records where they're available, using self-responses at 98% accuracy where administrative records are not available. But the problem is you can't confuse the survey, which is really the question of 6C. No. Or the focus. It's not. 6C applies to all census instruments, not just the census. It fully applies to the American Community Survey. But the ACS is not used for the citizenship purpose. But, Your Honor, your question is about 6C. 6C applies to the ACS, and it applies to the census. And sex and age information, which we ask on the census, is also available in administrative records. Indeed, administrative records are more accurate with respect to sex and age because presumably your birth date and your sex don't change over the course of time, whereas your citizenship status does. So if you really think that 6C is a problem, we can't ask it on the ACS, and we can't ask sex and age on the census. So that's why I think that is plainly wrong. It really does boil down to whether the secretary's judgment here is a reasonable one, and in the face of two competing possibilities, either asking the question, getting answers for two-thirds of the people for whom no administrative records existed at 98% accuracy, or using an estimation model that had not yet been created and had an unknown error rate, the secretary reasonably chose to go with a bridge in the hand. General, just going back to Justice Kavanaugh's simple question about why the secretary thought that there was a need for this data, and then part of what Justice Sotomayor was talking about was that it did really seem like the secretary was shopping for a need. It goes to the Justice Department. The Justice Department says we don't need anything. It goes to DHS. DHS says they don't need anything. It goes back to the Justice Department. It makes it clear that he's going to put in a call to the Attorney General. Finally, the Justice Department comes back to him and says, okay, we can give you what you want. So you can't read this record without sensing that this need is a contrived one. There have been lots of Assistant Attorney General in the Civil Rights Division that have never made a plea for this kind of data, and just the way this went back and forth, I guess I'd like an answer to that simple question. Sure, and I have two responses, Your Honor, and then, if I may, I'd like to reserve the remainder of my time for rebuttal. First, I think it is quite common for Cabinet secretaries to come into office with ideas and inclinations to discuss with their staff and discuss with their colleagues whether there is a legal and policy basis for that inclination. Secondly, there is no evidence in this record that the secretary would have asked this question had the Department of Justice not requested it, and there is no evidence in this record that the secretary didn't believe that the Department of Justice actually wanted this information to improve Voting Rights Act enforcement. Thank you, General. General Underwood. Mr. Chief Justice, and may it please the Court, the secretary decided to add this question about citizenship to the 2020 Census, although the record before him contained uncontradicted and strong evidence that it will cause a decline in the response rate of noncitizens and Hispanics to the detriment of the states and localities where they live. He gave three reasons for the decision, and none of them can survive a PA review. One, he said there was inadequate evidence of an effect on the response rate, but that is flatly contrary to the record. He said he could dismiss or discount any such effect because nonresponse is an illegal act, but that is an irrational and impermissible factor to consider on this question. And he said that adding the question would help voting rights enforcement, but that claim is unsupported by the record as well. Do you think it wouldn't help voting rights enforcement? The CVAP, citizen voting age population, is the critical element in voting rights enforcement, and this is getting citizen information. Well, as has been discussed at length during the previous argument, the evidence before him was that it would not give better citizenship information. It's the 22 million that the government points to, the 22 million whose citizenship information will be either modeled or the result of the answer to a Census question. Was there anything that showed that the department would have been aided in either past cases or cases on the drawing board? There was not, and what I'd like to point out is that the comparison should be to using administrative records. The Department of Justice letter, taken at face value, says the old ACS survey data that we've been using is inadequate, and we need an improvement over that. The Census Bureau produced this answer, which is we can do this by linking the existing census information to administrative records. The Department of Justice never commented on that. The Department of Justice actually declined to meet with the Census Bureau people who wanted to meet about it. So there was nothing before the Secretary to say that this census information would be an improvement, and there was no comparison at all from the Department of Justice about whether this would be an improvement or not. It seems to me that at least with so much question about whether this information would be better or worse than the use of modeling from administrative records, the Secretary had an obligation to find out the answer to that question. What if the answer was uncertain? Well, if the answer is uncertain, then it is hard to invoke that as a reason. Now we get back to the cost in the enumeration. That is, if it's unclear, we think it's worse, but if it's just unclear whether this question will improve voting rights enforcement, that is not sufficient to pay the cost of the steep decline in the enumeration, because the enumeration is, after all, the primary purpose of the census. On the modeling, there was a lot of talk during the first part of the argument about, I think it's 22.6 million people who it is predicted would answer the citizenship question and as to whom there is not administrative data. And there was an estimate that those answers would be 98 percent accurate. And the comparison then has to be between that 98 percent predicted accuracy rate and whatever the accuracy rate would be for the model. And is there anything in the administrative record that shows that the model was tested and that it was possible to extract a predicted error rate for the model? What we have is that the model hadn't been generated, but what we have is the Census Bureau saying, this is like other modeling that we routinely do. We're confident that we can do it. So if the secretary has to choose between two things, and on one, the secretary knows there's a 98 percent accuracy rate, and as to the other, the Census Bureau says, we're going to create a model and we can't give you any statistics, but trust us, it's going to be more accurate than 98 percent. It's arbitrary and capricious for the secretary to say, I'll go with the 98 percent because that's a known quantity. If there were no cost to the enumeration, that would be a different question. But when there is this much uncertainty, then it is arbitrary and capricious to take that kind of risk with the enumeration. I don't understand uncertainty. I thought the 98 percent, of course it's 98 percent. Most people are citizens. The people who are citizens are not going to, you know, they'll say they're citizens. All you'd ever expect are a few percent who are not citizens. Then I have on pages joint appendix 882 through 884, Mr. Abowd's testimony, where he unequivocally says three times that, not 98 percent, In respect to those people who are not citizens, the administrative model will be more accurate than just asking the census question. And if you add the census question, that you look to it for the answer, you will discover that you are less accurate in respect to non-citizens. Now he says that. That's why I asked the Solicitor General, what is there contrary to that? And he gave me things to look at. And I would say the most contrary thing, which I want to ask you about, is Dr. Abowd at the trial said, All right, that's what he said. Now, I'm sure in their reply brief they pointed right to that. We can't simply ignore it. And so I want to hear what your answer is to that, which the government says is contrary evidence. If you look at that testimony in context, it is perfectly clear that what he is saying is that he didn't have enough evidence for a firm quantitative statement meeting scientific standards. He actually defined the term credible quantitative evidence. And if you'll bear with me, he said, That's the evidence that he found was not available? Yes, that's right. He said he didn't have enough to quantify in accordance with peer-reviewed standards. He didn't say there would be no effect. He said, I don't have enough to give what I believe as a scientist to be this term, to make a credible quantitative evidence. Can I ask, I'm sorry, please finish. And my point is that at the same trial, if we're going to look at the trial testimony at the same trial, other experts said maybe so, but there is enough evidence to make a different kind of judgment, not a firm scientific quantified judgment, but a judgment. Do you think it's proper to look at the trial record on this issue? There's a lot of citation in the respondent's brief to trial testimony. Aren't we reviewing the administrative record? We are. Well, as for standing, we're reviewing the whole record. That's correct. But as to the arbitrary and capricious review? Correct. That is correct. But that would make this statement also of Dr. Abad off the record, off the administrative record. Can I ask a question? Yes, please. Please finish. No, going back to your question, while I think there is good evidence and nothing contrary that this $22 million would be more accurately identified by the modeling than by the census, I think it is sufficient for this purpose to treat it as somewhat uncertain, because it is uncertainty with respect to the discretionary part of what the Census Bureau does, namely collect extra information, the core function of the census, not of the Census Bureau in all its actions, but on the census. The United Nations recommends that countries ask a citizenship question on the census, and a number of other countries do it, Spain, Germany, Canada, Australia, Ireland, Mexico, ask a citizenship question. And the United States has asked a citizenship question, as you know, in one form or another since 1820, excluding 1840, and again, long form at times in more recent times, and then on the ACS since 2005. The question is, does that international practice, that UN recommendation, that historical practice in the United States affect how we should look at the inclusion of the citizenship question in this case? The same guidance from the UN also says to be careful, to test questions, to make sure they don't interfere with the enumeration. It says you need to make a judgment in context. It may be that those countries either haven't examined or don't have the problem that has been identified, the problem of depressing the enumeration that the United States has. It's certainly something to look at. But you agree it's a very common question internationally. Well, it is certainly useful information for a country to have, and I'm not suggesting at all that that information shouldn't be collected. The question is whether it should be collected on the very instrument that is, whose principal function is to count the population when we have such strong evidence that it will depress that count, make it less accurate, and make it less accurate. Well, the principal purpose, you're right, the principal purpose is to count the population, but we've had demographic questions on the census. I don't know how far back, but certainly it's quite common. That's correct, but we have no evidence. Sex, age, things like that. You go back and it looks, you know, do you own your house? Do you own a radio? I mean, the questions go quite beyond how many people there are. Well, I'd like to say two things about that. We have no comparable evidence about any of those other questions that they depress the count in this substantial a way and in this disproportionate a way because, as this Court said in Wisconsin, distributive accuracy is even more important for the census. The response rate is very important, so can I ask you a question about that? A lot of your argument and a lot of the district court's argument seems to hinge on this prediction that there will be 5.1% fewer responses if the citizenship question is included on the census. But that is based, as I understand it, on the fact that noncitizens are somewhat less likely to complete the ACS, which includes the citizenship question, than are citizens. Am I right in understanding that? That's fundamentally where that comes from? It's not about not completing. It's about not, I mean, it's not about skipping questions anymore. Not responding. Not responding. That's correct, okay. They're somewhat less likely to respond to the ACS than are. The ACS in one study and the long form in another. Okay. But what jumps out is the fact that citizens and noncitizens differ in a lot of respects other than citizenship. They differ in socioeconomic status. They differ in education. They differ in language ability. So I don't think you have to be much of a statistician to wonder about the legitimacy of concluding that there's going to be a 5.1% lower response rate because of this one factor. But maybe there's something more there. So what does that analysis miss? Well, a couple of things. The strong empirical evidence that is the basis for that judgment, which, by the way, has not been contested by the government. The government has other things to say but does not contest this decline. I thought they did. But in any event, go ahead. Is a retrospective review of comparing in one case for 2010 the short form census and the ACS. And in 2000 it was to compare the short form and the long form census. It's a comparable comparison. In each case the longer one had a citizenship question on it. In each case, everyone, population groups notwithstanding, there was a decline from the short form to the long form. But there was a much greater decline among Hispanics and noncitizens. But, counsel, doesn't Justice Alito have a point to the extent that there could be multiple reasons why individuals don't complete the form? Go ahead. Plenty of interrupting. But we don't have any evidence disaggregating the reasons why the forms are left incomplete. What do we do with that? I mean, normally we'd have a regression analysis that would disaggregate the potential causes and identify to a 95th percentile degree of certainty what the reason is that persons are not filling out this form. And we could attribute it to this question. We don't have anything like that here. So what are we supposed to do about that? Well, I think there are a few things to say. And let me just throw one other question. I know your light's on, but I really wanted to get it to you, and I'm sorry we haven't gotten there. And that is what do we do also, and it's totally different, so I'm really sorry. What do we do with the fact that, as I understand it, some of the respondents and other people in litigation have complained when folks have relied on the ACS to extrapolate citizenship for purposes of redistricting and, in fact, argued that we should rely only on actual census data? And I understand respondents have made that argument in litigation. So what do we do with that? There are a lot of complaints about the ACS. The Census Bureau's proposal to use administrative records solves most of them. It's not a question of just the ACS, which is a survey about which there have been many complaints, and putting the question on the census. The Census Bureau is – they are data experts. There are many ways of trying to collect data. The question in this case is whether doing it on the census form is warranted, even though it causes such a harm to the count. I recall from Dr. Abboud's testimony, or at least the letter somewhere I read, that they controlled for all of the other reasons that Justice Gorsuch was mentioning as reasons why people would not complete. Well, they certainly controlled for the length of the form. It's not just that on page 110 of the Joint Appendix. It says whether the response – they're much greater. It says incomparable rates for other democratic variables like sex, birth date, age, race, ethnicity. So I thought that that was an effort to control for the things that Justice Alito mentioned, insofar as they're relevant. It was. The only limitation on it was that they had to deal with data that already existed. Dr. Abboud wanted to do a random control test of this question and wasn't permitted to do so. That's a different issue, isn't it, what Justice Breyer mentioned? It's the decline in the response rate based on those variables. It doesn't, as Justice Gorsuch says, disaggregate the many factors that could explain a decline when you're distinguishing between citizens and non-citizens. Well, it did try to control for other properties that citizens have and non-citizens have. It's fair to say we don't have this isolated, though, isn't it? They did their best. There is some degree of isolation, enough to enable them to believe that they had isolated the factors that people thought of as plausible. I mean, there are a million factors. There's pet dogs, you know. I mean, there are cats. And so if, in fact, there were some factors that are relevant, which were not in the data, because they only controlled for six other factors instead of 600, I would expect somewhere in this record someone to have written that there were these other factors that also should have been controlled for. I know what you're going to say. Unless I'm wrong, you better not tell me that I am right if I'm not. I could not find any such place in the record. Nobody proposed that I know of proposed factors that might be alternative explanations that should have been tested for. And would it be right to say, General, that it was the Census Bureau's conclusion, a bureau full of statisticians, that it was the citizenship question that was driving the differential response rates? That is correct. Are there other questions on the census for which the administrative records provide more accurate information? There is nothing in the record about that. Well, then I don't want to hear about it. Okay. Would you add to General's point that if you rely on 6C, then you shouldn't be even asking this on the ACS form? No. For one thing, in order to do modeling, in order to do sampling, they need some survey data to compare it to. And so some judgments can be made, and the judgment might be made that the ACS or some questionnaire that doesn't involve harm to the count, that is sampling or some other form of less than universal questioning, that testing questions on that kind of instrument is the way to do it. Thank you, General. Mr. Ho? Mr. Chief Justice, and may it please the Court, the Secretary's decision rested primarily on one assertion, that it would improve the accuracy of citizenship data provided to the Department of Justice. But the administrative record revealed precisely the opposite, that it would make that data less accurate and thus harm the Secretary's stated purpose of Voting Rights Act enforcement. And the Secretary's explanation for his decision misstated the evidence in the record in three critical respects. First, the Secretary asserted that adding the question would maximize the Census Bureau's ability to use administrative records on citizenship. But the government has conceded that that was not true. At page 32 of their brief, they acknowledge that if the question is added, the number of people who can be matched to these administrative records, the most accurate information that we have on citizenship, will fall by one million. Second, the Secretary asserted that adding the question would improve the Bureau's imputation of citizenship for people for whom the government lacks any such records. But the government has conceded that that was not true either. At page 34 of their opening brief, they acknowledge that the Census Bureau determined that if the question is added, the imputation process will become less accurate. And here's why. The accuracy of imputation depends upon the accuracy of existing data. Federal administrative records are based on a person's legal documents of their citizenship and thus are quite accurate and reliable for this purpose. But the citizenship question is not. The evidence shows that non-citizens respond to the question inaccurately one-third of the time. So if the question is used, the data that's used for imputation will be contaminated by those incorrect responses, making the output of the imputation process less accurate, making the data less accurate, and again, harming the Secretary's stated purpose of improving the accuracy of citizenship information. The Secretary misstated the evidence in a third respect. He asserted that adding the question would fill in the gaps for 22 million people in administrative records on citizenship, but the Census Bureau concluded specifically on the last page of their March 1st memo in the administrative record that the Secretary's decision will not solve that problem. And the reason is, again, because responses to the question are highly inaccurate, whereas the imputation process, based solely on administrative records, would be more accurate. That's reflected in the Census Bureau's bottom-line conclusion in its March 1st memo, and it's reflected in the testimony of Dr. Abowd at trial. But let's take this back, does it not, if I'm following your argument, to the 22.6 million people who will answer the citizenship question but ask to whom there aren't administrative records, that's what you're talking about? Yes, Justice Alito. Okay. And so then this is territory that we've covered. But if the Secretary is told, here's the error rate that we can expect for those who answer the citizenship question, and on the other hand, we have this model, and we can't tell you how accurate it is, but trust us, it's going to be better, is it arbitrary and capricious for the Secretary to say, I don't want to go with this model because I don't know what the accuracy of that is? Justice Alito, respectfully, I think the Census Bureau said a little bit more than trust us. What the Census Bureau said was, we can develop a highly accurate model for this that's going to be better than getting the question wrong one-third of the time. Yeah, well, they said, in our opinion, this would be better. But they can't quantify it. They don't provide a specific number, they don't even provide a range. Am I right on that? They do say that it would be more accurate than responses to the citizenship question, which they do quantify as being incorrect one-third of the time for noncitizens. Justice Kavanaugh's question earlier about whether or not that can help with Voting Rights Act enforcement, it can't, and here's why. Citizenship data matters in the Voting Rights Act. I'm sorry, just what can't? I lost sight of the if in your answer. The Secretary's decision, Mr. Chief Justice. I thought you were talking about whether it's helpful with respect to the voting rights information. That's right. Adding a citizenship question to the census, I'm sorry, is not helpful for Voting Rights Act purposes because responses to the question are inaccurate so frequently for noncitizens. Citizenship matters in the Voting Rights Act context when you're dealing with a population in which there's a large number of noncitizens. The VRA requires the drawing of districts in which minority voters constitute a majority, sometimes under some circumstances. Now, under normal circumstances, voting age population data will be sufficient for that purpose if citizenship rates are high. But if the minority group has relatively low citizenship rates, for example, as is the case with Hispanic populations in some circumstances, then you need citizenship data to make sure that you're drawing a district in which minority voters are in fact a majority of the population. Data that's wrong one-third of the time with respect to noncitizens just doesn't help you draw districts at that granular block-by-block level. When we talk about the block-by-block level, one of the complaints that we've heard from the other side is that the data that we rely on from the ACS is at too high a level and that the census goes down to a more granular level. In fact, some of the states who are now respondents before us have in litigation, including in this court, argued that ACS data should not be relied upon for purposes of citizenship or other purposes, that the census data is more accurate. What do we do about that? It seems to me like you kind of put the government in a bit of a catch-22. You say they shouldn't use the census, except for in later litigation when they have to use the census. Justice Gorsuch, let me say two things in response to that. The first is that to the extent that more granular citizenship data were in fact necessary for Voting Rights Act enforcement purposes, and we, I think, set forth a number of reasons in our brief why that's not in fact the case. But just assuming that it is... We know states have argued this, including some of the respondents before us. It is a thing. That's fair. But what the Census Bureau recommended was that it could develop that block-level data either with existing ACS data or using administrative records, and that that would be in fact the best and most accurate way to do that. The states that said previously that wasn't enough now are going in all future litigation to bind themselves to accept that it is enough. Are you prepared to say that? Justice Gorsuch, we've never taken... Our clients have never taken that position, and I'm not aware of my organization ever taking that position. How about the under-reporting, the folks who stop and break off answering the long form? And we're asked to believe that that's solely attributable to this question. We have a whole bunch of states that say that, in fact, the break-off rate because of that question, at that question, is something like 0.36%, so that it's very difficult to understand why that question would be the cause of people stopping and answering, whereas another possible explanation that hasn't been explored, as I understand it, at least, is the length of the form itself may deter those with less means and less time to fill them out. Just as simple as that. And we don't know. And what do we do with the fact that we don't know? Justice Gorsuch, the Census Bureau's conclusion was that the most likely explanation was the citizenship question. The only difference in that comparative estimate was the presence of a non-citizen in a household, and citizenship is obviously the most salient question that goes to the difference between those two populations. And the number on the break-off rates for the Internet ACS survey, which I believe Your Honour was referring to, they showed that Hispanics were actually eight times as likely to break off in responding to the ACS upon encountering the citizenship question. Now, by contrast, there isn't a shred of evidence in the administrative record that suggests that this question will not have the effect of harming response rates or will actually improve the citizenship data provided to the Department of Justice. But if I could make one other point in response to your earlier question, Justice Gorsuch, adding the citizenship question doesn't even solve that granularity problem that you referenced. And here's why. Because the Census Bureau can only produce estimates of citizenship at the block level. The government has now conceded that on page 18 of their reply brief, which is quite remarkable, because the government's rationale for asking this question has been to provide a full count of citizenship. And because of the Census Bureau's disclosure avoidance protocols, it actually can't do that at the block level. It undermines the whole rationale for adding this question. And the Secretary didn't even address it in his decisional memo, which renders his decision arbitrary and capricious under State Farm. It seems to me... What is the it in that sentence? What did the Secretary not address? He did not address the fact that because of the Bureau's disclosure avoidance protocols, it can only provide estimates of citizenship at the block level. If I could, let me explain why. The statute requires the Census Bureau not to disclose information that could result in the identification of a person's census responses. If you have 100 people living on a block and the Census Bureau says, well, there are 100 citizens there, you will have necessarily identified all of their census responses. So what the Bureau does is it alters demographic totals for census blocks before publishing them. That means that that data is an approximation. It's an estimate, just like the ACS data that the Department of Justice currently relies on. And here's what's critical. Well, this gets really, really technical. But, well, I'm sorry. No, go ahead. That's fine. Okay. Thank you, Counsel. Thank you, Your Honor. Mr. O'Leary. Mr. O'Leary. Mr. Chief Justice, and may it please the Court, I just want to say right up front, the Speaker of the House wishes to thank the Justices for their courtesy in hearing from the House today. Tell her she's welcome. Thank you. I'll pass that along to her, Chief Justice. I want to hit just a couple of points, but one of the ones I want to hit right up front is something that General Underwood said, and I think bears some emphasis, which is remember that the census that we're talking about here is the decennial census provided for in the Constitution of utmost importance to the House of Representatives. That provision, obviously, has to be the grounding for the statute that is being applied here. And so anything that undermines the accuracy of the actual enumeration is immediately a problem. So there's been a lot of discussion here, quite properly, because of the way this case has been briefed, about will this help the Justice Department and the Voting Rights Act, et cetera. And that may be a very important point, but it is not why the Census Bureau carries out an actual enumeration which goes through the apportionment of representatives among the states and then distribution within the states. So if there is something that undermines the accuracy of that count, even if it's important for other reasons, that is both a statutory violation and therefore a violation of the Administrative Procedure Act and a constitutional violation. Now, this Court does not have to reach a constitutional question because it is a statutory violation. But do you think that any decrease in the actual count, if you add any question beyond counting people and that decreases the actual count to any degree, then that additional question is improper? Justice Alito, I'm sure that the Court would find there's a de minimis exception. There's no doubt about that. So where this Court would draw that line, I don't know what I can tell you, and I'm sure you know this, but I'll just... This Court said in the Wisconsin case that the question there was, could a statistical adjustment be made? And this Court set the standard of what actual enumeration means, and it says a reasonable relationship to the accomplishment of an actual enumeration. And this discussion about the importance of voting rights data obviously does not bear a reasonable relationship to the accomplishment of an actual enumeration. Mr. Laird, I'm sure you've given this some thought, but I know you have. In terms of assessing what a reasonable relationship is, what do we do with the history? And the fact that this question has been on for what a long time was the only form in the census through almost all of our history. And it continues to be asked today in the long form or in the ACS. It's not like this question or anybody in the room is suggesting that the question's improper to ask. It's in some way, shape, or form. And what do we do as well with the evidence of practice around the world? And virtually every English-speaking country and a great many others besides ask this question in their censuses. So I'm sure you've given thoughtful consideration to those questions. Absolutely, Your Honor, although I can tell that you also have. First of all, I don't know if the other countries that are listed, for instance, in the UN recommendations, have an actual enumeration clause written into their constitution that is of paramount importance. So I'm not sure that when the UN made that recommendation that that matters for the United States. Second, Your Honor, if there are other factors that would undermine actual enumeration, there is no evidence in the record here. As the Chief Justice pointed out, we're dealing with the record here. It may be that some people find questions about gender now offensive or maybe in the future that will be deemed offensive and that would undermine the accuracy of the actual enumeration. We don't have any evidence on that. What we do know, Your Honor, as you quite correctly pointed out, we have a history of this, but what we do know now is the experts right now say that this question, if it is put on the form, which, remember, is the only form right now for the actual enumeration, that will cause... that will make the undercount worse. Mr. Leonard, the Congress has the primary control over what the census will be, not the executive, and Congress has been alerted to this citizenship question for some time, and it has done nothing about it. So one question is, who should decide? Congress? It's silent. Should the Court then step in? It's a very fair question, Your Honor. Two responses. One, I think that this is a very ironic point for General Francisco to be making. He has emphasized in his brief, Congress knows about this. Congress should do something. The Court can take judicial notice of this because it's in the public record. The Secretary of Commerce has been called before Congress to explain what he did here, and Assistant Attorney General Gore, the author of the request by the Justice Department, has been called to Congress. They have been declining to answer. They're not giving Congress the information it requests because they say there's litigation going on. And I repeat, this is a matter of public record. So it's ironic for General Francisco to be saying, this is for Congress. Well, if that's for Congress, obviously the House needs the information, and yet we're being told we can't have the information because it's only for you. I thought all the information available, as I understand it, leads to only one answer. And so why isn't that answer sufficient for them to take whatever action they consider appropriate? I'm sorry, Chief Justice. Well, we've been told there was no basis for the Secretary to make any decision other than the recommendation that was submitted to him by the Bureau because that's the evidence. That's the scientific evidence. And so there's no room for the exercise of any discretion. So what more information does the Congress need to address the problem? We want to know what... You decided otherwise. Why did you decide? As we know, his letter provides not... the memo provides not much information. The justices here today have been asking these key questions. So we want to know, what made you decide this? Was this just the political... Well, I thought Justice Ginsburg's question went more to why doesn't Congress prohibit the asking of a citizenship question in the same way that Congress has explicitly provided that no one can be compelled to provide religious information? Right. And so that is something that Congress could attempt to do, yes. And that is one of the things that would be asked about. But as we know, that doesn't stop this Court from interpreting the statute and the Constitution. As we know, this Court is the final... On the statute, I had one question, which is you make a good first principles point about enumeration being the purpose of the census. But it turns out that the census, as you know, has been used for lots of other statistical and demographic collection purposes throughout our history. So it's not just for enumeration, and the statute that Congress has passed gives huge discretion to the Secretary how to fill out the form, what to put on the form. So how are we to think about enumeration when the history and the statute suggest that there is more than just enumeration that's at stake here? Your Honour is exactly right. The census information, census data, are used for all sorts of things that are very important. Remember, the Census Bureau does things way beyond just the decennial census actual enumeration. But again, this Court was very clear... And by the way, the other thing is, General Francisco has argued no review. This Court has reviewed how the actual enumeration has taken place, I think, about five times. So there's clearly judicial review here. Well, assuming there is review and assuming it's arbitrary and capricious, as you know, it's deferential. And the question, I think, here is a policy judgment that it's more important to get accurate citizenship information even at the expense, potentially, of a slight decrease, potentially, in response rates. And the question is, given the statutes, why does that judgment fall below the standard of reasonableness in assessing different policy considerations? Our position is that, one, the Justice Department can get this information elsewhere, as we know, but, two, you can't undermine the accuracy of the actual enumeration in order to get information for the voting rights. So the constitutional backdrop, I think, of translating your argument, means that anything that would undermine the enumeration is impermissible and unreasonable. I believe so, Your Honor. And the only addition I would make to that is, as I said to Justice Alito, undoubtedly, there's a de minimis determination. But, again, this Court is the expert on the Constitution. Thank you. Thank you, Counsel. Four minutes, General Francisco. Mr. Chief Justice, thank you. I'd like to make four points. First, on the disclosure avoidance protocols, we discussed those at our reply brief at page 17. The bottom line is that those protocols apply to all census data, including on sex, on age, on race, that the Department of Justice uses to construct citizen voting age populations. It's never been a problem before. There's no reason to think it'll be a problem now. And, in fact, I think in the trial record, Dr. Abad testified how it would not be a problem. Second, I'd like to point, Your Honors, to the Key Differences Memo at page 148 of the Joint Appendix, the one full paragraph. The first sentence says, the relative quality of Alternative C versus Alternative D will depend on the relative importance of the errors in the administrative data, response data, and imputations. It then goes through and discusses the various types of errors. And its final conclusion is, unfortunately, the Census Bureau cannot quantify the relative magnitude of the errors across the alternatives. Third, in terms of response rates, the administrative record shows that the Census Bureau staff believed that there would be a 5.1% decrease in the initial response rates from adding the citizenship question. But as Secretary Ross points out in his memorandum, that doesn't take into account follow-up operations. That's the response rate drop before follow-up operations. And it doesn't disaggregate between those who are going to be put off by the citizenship question itself as opposed to those who are put off by the larger macro environment because they don't trust the government or don't like this particular administration. And that, I think, is one of the reasons why Dr. Abowd concluded in the testimony that Justice Breyer cited that, quote, there's no credible quantitative evidence that the addition of the citizenship question will affect the accuracy of the count. We thought that Dr. Abowd stated and the district court found that the follow-up process was at best riddled with a number of inadequacies and that it wouldn't be adequate enough to take care of the shortfall. Well, we can debate about whether it would be adequate enough, but in order to say that the final self-response rate would drop by 5.1%, you have to conclude that it's 0% accurate. And I don't think that there's any basis in the record to conclude that it's 0% accurate. So how much accuracy would be... Let's assume it were 5.8 or something close to it. Is that de minimis to you? Is that inconsequential? I think that that is largely an impossible question to answer that is not built into the Constitution itself. There's always going to be a trade-off. The long-form census, for example, caused a drop in self-response rates relative to the short-form by, I believe, around 10%. But my final point is one that Mr. Leder alluded to, and that is under... That's when you keep the short-form. Right, Your Honor. And under my friends on the other side's position, you are effectively empowering any group in the country to knock off any question on the census if they simply get together and boycott it. There are many people in this country who might find the sex question objectionable because it limits individuals to a binary choice. If a large number of people got together in one state and said, we're going to boycott the census, as long as you include that sex question, you're effectively empowering them to knock that off. Justice Sotomayor? Are you suggesting that Hispanics are boycotting the census? Are you suggesting they don't have, whether it's rational or not, that they don't have a legitimate fear? Not in the slightest, Your Honor. I am suggesting that the risk of my friend's theory on the other side is that accountants is precisely that type of coordinated behavior that would empower groups to knock off any question of the census that they found to be particularly objectionable. Mr. Chief Justice, unless the Court has further questions... We're all done. Thank you, Your Honor. Thank you, General. The case is submitted.